# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

JUL 16 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                  DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. |
| One Black LG Rebel 4 cellular telephone bearing International Mobile Equipment Identity (IMEI) 356593091473144 | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Section 1324 | Alien Smuggling, Conspiracy to Commit Alien Smuggling |

The application is based on these facts:

See Attached Affidavit incorporated herein

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

James Burns, United States Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  7/16/19

*Judge's signature*

City and state:  San Diego, California

Jill L. Burkhardt, United States Magistrate Judge
*Printed name and title*

1  **AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

2       I, James Burns, having been duly sworn, do hereby state that the following is true to

3  my knowledge and belief:

4                        **INTRODUCTION**

5       1.     I make this affidavit in support of an application for a warrant to search the

6  following electronic devices, as further described in Attachments A1 and A2, respectively

7  (incorporated herein by reference), and seize evidence of crimes, specifically, violations of

8  Title 8, United States Code, Section 1324, as more particularly described in Attachments

9  B1 and B2, respectively:

10

11              One Black LG Rebel 4 cellular telephone bearing
                International Mobile Equipment Identity (IMEI)
12              356593091473144
13              **("Target Telephone 1")**

14              One White LG Q6 cellular telephone bearing Mobile
                Equipment Identifier (MEID) 089903642503344741
15              **("Target Telephone 2")**

16

17  This search supports an investigation and prosecution of Jesus Montes ("MONTES") for

18  the crime mentioned above.  A factual explanation supporting probable cause follows.

19       2.     A United States Border Patrol (USBP) agent seized **Target Telephone 1 and**

20  **Target Telephone 2** from MONTES on May 1, 2019, when he was arrested while

21  transporting two illegal aliens into the United States in a vehicle near Calexico, California.

22  **Target Telephones 1 and 2** are currently in the possession of USBP and is being

23  maintained in the evidence vault at 536 Barbara Worth Road, Calexico, California 92231.

24       3.     Based on the information below, there is probable cause to believe that a search

25  of **Target Telephones 1 and 2** will produce evidence of the aforementioned crime, as more

26  particularly described in Attachments B1 and B2, respectively (incorporated herein by

27  reference).

28

4.     The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. Dates, times and amounts are approximations unless otherwise noted.

## TRAINING AND EXPERIENCE

5.     I am employed by the United States Customs and Border Protection, United States Border Patrol (USBP) as a Border Patrol Agent (BPA). I am currently assigned to the El Centro Sector, Prosecutions Unit. I attended the USBP Academy in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for ten years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violation of Titles 8, 18, 19, and 21 of the United States Code. My current duties involve investigations into alien smuggling organizations. During my tenure with USBP, I have regularly and routinely engaged in observation, surveillance, apprehensions, and preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones.

6.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of alien smuggling investigations, and the opinions below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support issuing a search warrant, it does not include all the facts that have been learned during the course of investigation. When the contents of documents or statements of others are reported herein, they are reported in substance and part unless otherwise indicated.

7.     During my tenure as a USBP agent, I have interviewed Defendants and witnesses regarding their alien smuggling and illegal trafficking of controlled substances.

Through my observations and these interviews, I have gained a working knowledge and insight into the normal operational habits of alien smugglers.

8.     Through the course of my training, investigations, prior law enforcement experience, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones and portable radios to maintain communications with co-conspirators in order to further their criminal activities. I am also aware that it is a common practice for alien smugglers to communicate with the smuggled aliens regarding smuggling arrangements and payment utilizing cellular telephones and portable radios. Alien smuggling conspiracies generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators and aliens to be smuggled.

9.     Based upon my training and experience as a USBP agent, and consultations with law enforcement officers experienced in alien smuggling investigations, I know that persons engaged in alien smuggling activities tend to use cellular telephones for communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data, for the following:

a.     Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, voice messages, camera, internet, and various applications which can be used to aid them in their illicit activity.

b.     Alien smugglers will use cellular telephones because they are able to actively monitor the progress of the aliens while they are in transit.

c.     Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time the aliens will arrive at predetermined locations.

1
2
3
4
5
6
7
8
9
10
11
12
13

    d.     Alien smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of the aliens.

    e.     Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f.     Alien smugglers and their co-conspirators often use cellular telephones to communicate with load drivers who transport the aliens.

    g.     Conspiracies involving alien smuggling often generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators.

14      10.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity
15  modules, are smart cards that store data for cellular telephone subscribers.  Such data
16  includes user identity, location and phone number, network authorization data, personal
17  security keys, contact lists and stored text messages.  Much of the evidence generated by a
18  smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been
19  utilized in connection with that telephone.

20      11.    Based upon my training and experience as a USBP agent and consultations
21  with law enforcement officers experienced in smuggling investigations, and all the facts and
22  opinions set forth in this affidavit, I have learned that cellular/mobile telephones often
23  contain electronic records, phone logs and contacts, voice and text communications, and
24  data such as emails, text messages, chats and chat logs from various third-party applications,
25  photographs, audio files, videos, and location data. This information can be stored within
26  disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent
27  files contained on or in the cellular/mobile telephone. Specifically, based upon my training

28

and education, I have learned that searches of cellular/mobile telephones associated with smuggling investigations yield evidence:

a. tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling illegal aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States;

d. tending to identify travel to or presence at locations involved in smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States, such as stash houses, load houses, or delivery points;

e. tending to identify illicit proceeds, cash, checks, wires, bank accounts, financial records, financial transactions, ledgers, or other information related to proceeds derived from smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States;

f. tending to identify the user of, or persons with control over or access to, the subject phone; or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

**PROBABLE CAUSE**

12.  According to a report written by USBP Agent Marcos J. Andrade, on May 1, 2019, at approximately 1:00 a.m., a USBP Remove Video Surveillance System (RVSS) operator observed two suspected illegal aliens running northbound toward Interstate 8 and a hydroelectric plant located 100 yards north of Interstate 8, an area known to USBP agents as "Drop 1." In this area, Interstate 8 is approximately .25 miles north of the International Boundary Fence between the United States and Mexico. This area is consistently used by smugglers to smuggle illegal aliens into the United States because of its proximity to Interstate 8.

13.  According to Agent Andrade's report, the RVSS operator continued to observe the two suspected illegal aliens as they ran north across Interstate 8 and then proceeded to lay down on the ground next to some brush. The two suspected illegal aliens then stood up and approached the roadway. Then, the RVSS operator observed a four door Jeep Wrangler (bearing California license plate 8FFX951 and registered to Ashlea Dawn Morris), slow down and stop where the suspected illegal aliens were standing on the side of the road. The RVSS operator then observed the suspected illegal aliens quickly enter the Jeep and the vehicle drove off westbound on Interstate 8. The RVSS operator relayed this information via service radio to other agents in the area, including Agent Andrade.

14.  According to Agent Andrade's report, he responded to the last known location of the Jeep on Interstate 8 and continued westbound in an attempt to catch up to the Jeep while the RVSS operator continued to maintain visual contact with the Jeep. Agent Andrade caught up with the Jeep near the junction between State Route 98 and Interstate 8, approximately 10 miles from where the suspected illegal aliens entered the Jeep. Agent Andrade activated the emergency lights and sirens on his service vehicle, but the Jeep did not yield and instead continued westbound.

15.     According to Agent Andrade's report, he relayed the location of the Jeep to other agents in the area.  USBP Agent Raul Fuentes set up a Control Tire Deflation Device on Interstate 8, ahead of Agent Andrade and the Jeep.  The Jeep's tires were disabled by the device and the Jeep continued to travel an additional .5 miles until it came to a stop.

16.     According to Agent Andrade's report, he approached the Jeep after it stopped. The driver of the Jeep was later identified as MONTES.  There was a person sitting in the front passenger seat who was later identified as Richard Allen GUTIERREZ.  Agent Andrade also saw two persons located in the backseat.  They were identified as Adolfo Garcia-Garcia and Francisco Tinoco-Garcia and both individuals were determined to be illegal aliens.  Agent Andrade noted that the two aliens appeared to be dirty, which was consistent with Agent Andrade's experience with encountering persons who have entered the United States illegally by traveling through the nearby desert area.

17.     According to Agent Andrade's report, he went over to the driver's side of the vehicle and ordered MONTES to exit the vehicle.  As MONTES exited the vehicle, **Target Telephone 1** fell to the ground.  **Target Telephone 2** was located in the Jeep in the driver's side cup holder and MONTES verbally acknowledged it belonged to him.  A third cellular phone was found in GUTIERREZ's front pants pocket.

18.     According to Agent Andrade's report, Adolfo Garcia-Garcia was interviewed later that day by USBP agents.  Garcia-Garcia stated that he is a citizen of Mexico and that he made arrangements to illegally enter the United States and travel to Sacramento, California.  In exchange, he and his cousin, Tinoco-Garcia, were to pay $7,000 each to a smuggler known as "Tano."  Garcia-Garcia further explained that he had arrived in Mexicali, Mexico on April 26, 2019 and stayed in a pink house.  On April 30, 2019, a taxi took them to another house near Algodones, Mexico.  When they arrived at the second house, they were immediately taken to the border fence to cross into the United States. They scaled the border fence.  They were instructed to run straight toward the highway and to get into the first vehicle that stopped.  When they reached the highway, a black Jeep stopped and the driver unlocked the door and told them to get in.

*Affidavit in Support of Search Warrant*

19. According to Agent Andrade's report, Francisco Tinoco-Garcia was also interviewed later that day by USBP agents. Tinoco-Garcia stated that he is a citizen of Mexico. Tinoco-Garcia also stated that he and his cousin, Garcia-Garcia, had made arrangements with "Tano" to be smuggled into the United States. Tinoco-Garcia also stated that once he and his cousin arrived at the border fence, they scaled the fence and were instructed to get into the first vehicle that stopped.

20. Based upon my experience and investigation in this case, I believe that MONTES and GUTIERREZ are involved in alien smuggling activities. Based upon my experience, training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the alien smuggling activities of MONTES and GUTIERREZ, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of **Target Telephones 1 and 2**.

21. Finally, alien smuggling conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this requires planning and coordination in the days and weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo. Based on my training and experience, individuals such as MONTES and GUTIERREZ will attempt to minimize the amount of time they were involved in their smuggling activities and often times are actually involved for weeks and months longer than they claimed to be involved. Given those facts, I respectfully request permission to search **Target Telephones 1 and 2** for data beginning on February 1, 2019, up to and including May 1, 2019.

/ /

1

## METHODOLOGY

2      22.    It is not possible to determine, merely by knowing the cellular telephone's
3 make, model and serial number, the nature and types of services to which the device is
4 subscribed and the nature of the data stored on the device. Cellular devices today can be
5 simple cellular telephones and text message devices, can include cameras, can serve as
6 personal digital assistants and have functions such as calendars and full address books and
7 can be mini-computers allowing for electronic mail services, web services and rudimentary
8 word processing. An increasing number of cellular service providers now allow for their
9 subscribers to access their device over the internet and remotely destroy all of the data
10 contained on the device. For that reason, the device may only be powered in a secure
11 environment or, if possible, started in "flight mode" which disables access to the network.
12 Unlike typical computers, many cellular telephones do not have hard drives or hard drive
13 equivalents and store information in volatile memory within the device or in memory cards
14 inserted into the device. Current technology provides some solutions for acquiring some of
15 the data stored in some cellular telephone models using forensic hardware and software.
16 Even if some of the stored information on the device may be acquired forensically, not all
17 of the data subject to seizure may be so acquired. For devices that are not subject to forensic
18 data acquisition or that have potentially relevant data stored that is not subject to such
19 acquisition, the examiner must inspect the device manually and record the process and the
20 results using digital photography. This process is time and labor intensive and may take
21 weeks or longer.

22      23.    Following the issuance of this warrant, I will collect **Target Telephones 1 and**
23 **2** and subject them to analysis. All forensic analysis of the data contained within the
24 telephones and their memory cards will employ search protocols directed exclusively to the
25 identification and extraction of data within the scope of this warrant.

26      24.    Based on the foregoing, identifying and extracting data subject to seizure
27 pursuant to this warrant may require a range of data analysis techniques, including manual
28 review, and, consequently, may take weeks or months. The personnel conducting the

*Affidavit in Support of Search Warrant*         9

1    identification and extraction of data will complete the analysis within ninety (90) days,
2    absent further application to this court.

3    **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

4    25.    Other than as described above, the United States has not attempted to obtain
5    this information by other means.

6    **CONCLUSION**

7    26.    Based on all of the facts and circumstances described above, my training and
8    experience, and consultations with other law enforcement officers, there is probable cause
9    to conclude that MONTES and GUTIERREZ utilized **Target Telephones 1 and 2** to
10    facilitate violations of Title 8, United States Code, Section 1324.

11    27.    Because **Target Telephones 1 and 2** were promptly seized during the
12    investigation of MONTES and GUTIERREZ's smuggling activities and have been securely
13    stored since they were seized, there is probable cause to believe that evidence of illegal
14    activities committed by MONTES and GUTIERREZ continues to exist on Target
15    **Telephones 1 and 2**. As stated above, I believe that the appropriate date range for this
16    search is from February 1, 2019, up to and including May 1, 2019.

17    //

1      28.    Therefore, I respectfully request the Court issue a warrant authorizing me, an

2  Agent with USBP, or another federal law enforcement Agent specially trained in digital

3  evidence recovery, to search **Target Telephones 1 and 2**, as described in Attachments A1,

4  A2, respectively, and seize the items listed in Attachments B1and B2, respectively, using

5  the methodology described above.

6

      I swear the foregoing is true and correct to the best of my knowledge and belief.

7

8

9                     JAMES BURNS, AGENT

10                   U.S. Border Patrol

11  Subscribed and sworn to before me on

12  this ___16___ day of July, 2019.

13

14

15  THE HON. JILL L. BURKHARDT

  United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

*Affidavit in Support of Search Warrant*          11

<u>ATTACHMENT A1</u>
PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 8, United States Code Section 1324, is described below:

> One Black LG Rebel 4 cellular telephone bearing International Mobile Equipment Identity (IMEI) 356593091473144
> **("Target Telephone 1")**

currently in the possession of United States Border Patrol and is being maintained in the evidence vault at 536 Barbara Worth Road, Calexico, California 92231.

## ATTACHMENT B1
## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. The seizure and search of the cellular telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 1, 2019 up to and including May 1, 2019:

a. tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling illegal aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States;

d. tending to identify travel to or presence at locations involved in smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States, such as stash houses, load houses, or delivery points;

e. tending to identify illicit proceeds, cash, checks, wires, bank accounts, financial records, financial transactions, ledgers, or other information related to proceeds derived from smuggling undocumented aliens from Mexico to the

United States or smuggling undocumented aliens further into the interior of the United States;

f.       tending to identify the user of, or persons with control over or access to, the subject phone; or

g.       tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

which are evidence of violations of Title 8, United States Code, Section 1324.